IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 14, 2009

## STATE OF TENNESSEE v. RAYMOND CARLTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-07014     W. Mark Ward, Judge**

_____

**No. W2007-00654-CCA-R3-CD  - Filed July 17, 2009**

_____

The defendant, Raymond Carlton, was convicted by a Shelby County Criminal Court jury of felony murder, premeditated first degree murder, attempted especially aggravated robbery, attempted first degree murder, and attempted aggravated robbery.  The trial court merged the two murder convictions and sentenced the defendant to life imprisonment plus twenty-two years.  On appeal, he argues that the trial court erred in allowing questions concerning his prior convictions and arrests, and he challenges the sufficiency of the convicting evidence.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Wilson Jones, District Public Defender; Garland Ergüden (on appeal) and Michael Johnson (at trial), Assistant Public Defenders, for the appellant, Raymond Carlton.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham and Pamela Fleming, Assistant District Attorneys General, for the appellee, State of Tennessee.


**OPINION**

**FACTS**

In August 2002, the defendant was indicted on charges of the felony murder, premeditated first degree murder, and attempted especially aggravated robbery of James Wright, and the attempted first degree murder and attempted aggravated robbery of James Wilson as a result of a shooting the night of December 15 or early morning of December 16, 2001.  A trial was conducted in October 2006.

**State's Proof**

Jackie Wright, victim Wright's daughter, testified that he worked as a mechanic and that his nickname was "Mack" or "Mackie."

James Wilson, the surviving victim in this case, testified that he had been friends with victim Wright[1] for over forty years and was with him on December 15, 2001. Around 4:30 that afternoon, Wright visited Wilson's house after work, something he did often, because some neighbors were having a barbecue party. Wilson lived at 1162 Saxon Avenue, and Wright lived approximately fifty feet away on James Street, the closest crossroad to Saxon. The two stayed at the barbecue party until 11:00 p.m., when they walked to a nearby store to purchase another beer. They had "a couple of beers a piece" at the party and each bought one more at the store. After purchasing the beers, they walked back and stood in front of Wilson's house to talk.

Wilson testified that, as they were standing in front of the house, the defendant, whom Wilson knew as "Ray-Ray," ran up to them wielding a pistol and ordering that they "break" themselves. Wilson understood that to mean they were being robbed. Although the defendant was wearing a jogging suit with a hood, Wilson could see his face clearly and could tell it was the defendant. Wilson said he had known the defendant's family for over forty years. Wilson also recalled seeing the defendant pass by his house four or five times earlier that day.

The defendant pointed the gun in Wilson's face and "clicked" it, meaning he pulled the trigger but the gun did not fire. The defendant then turned the gun on Wright, who told the defendant to "[g]et the pistol out of [his] face," while simultaneously trying to move it away with his hands. The gun fired and hit Wright, then Wilson ran and hid. As he was running, Wilson heard the defendant click the gun about four more times, but the gun did not fire. Wilson remained hidden until the defendant left, and when he came out, he saw the defendant "taking his time walking around the street."

Wilson ran down the street to Wright's house and told his family to call the police because Wright had been shot. Wilson returned to Wright, who died shortly thereafter. When the police arrived, Wilson told them that the defendant had shot and killed Wright. Wilson identified the defendant from a six-person photographic array. Wilson said he did not see Wright use any cocaine that evening and that they were together the entire evening.

Tristan Turner, a longtime resident of the Saxon Avenue and James Street neighborhood, testified that Wright had lived across the street from him with Turner's grandmother for three or four years. Turner had also known the defendant and his family for "[s]ome years." On December 15, 2001, Turner walked his girlfriend, Sheneka Wilson, outside to her car around 10:30 or 11:00 p.m. and saw the defendant and a man named Ralph Jackson on the corner of the street. Within forty-five

---

[1] Hereafter, we will refer to victim Wright as "Wright" and victim Wilson as "Wilson."

seconds to a minute of returning inside, Turner heard gunshots. He went back outside and was met by his cousin, Warren Huggins, and Wilson who told him that the defendant had just shot Wright.

From his house, Turner could see Wright lying bleeding in the street, and Turner ran down the street to see if the defendant was still there. Turner ran toward the defendant's mother and grandmother's house and saw someone wearing the same jogging suit the defendant had been wearing that day and the previous day. When the man in the jogging suit saw Turner, he started to run between some houses. Turner started to pursue the man, but his uncle stopped him. Turner returned to Wright, covered him with a blanket, and waited for the police and an ambulance to arrive.

Turner later identified that defendant from a photographic array as the person he saw leaving the scene of the shooting. Turner admitted that he had a prior conviction for theft of property under $500. Turner acknowledged that he did not actually witness the shooting and that he did not see a gun that night. However, Turner knew that the defendant owned a gun in 2001.

Warren Huggins testified that on the night of December 15, 2001, he saw Wright and Wilson standing on a street corner as he drove down Saxon Avenue on the way to visit his grandmother. His grandmother lived across the street from his cousin, Turner. Huggins parked his car in his grandmother's driveway and heard two gunshots as he went to knock on the door. As he was walking back to his car, Wilson ran up and said that Wright had been shot. They started toward Turner's house across the street, and Turner met them outside. Turner asked Wilson who shot Wright, and Wilson said the defendant. Huggins estimated that less than two minutes elapsed from the time he saw Wright and Wilson on the corner to the time he heard the gunshots. Huggins acknowledged that he did not see who shot Wright.

Officer Richard Jewell with the Memphis Police Department testified that he was the first officer to respond to the scene, and he found Wright in "extremely critical" condition. No guns or drugs were found at the scene.

Sergeant Ernestine Davison testified that the defendant had already been developed as a suspect when she was assigned to the case the morning after the murder. Sergeant Davison was unable to locate the defendant in Memphis, and he was eventually extradited from Michigan.

Dr. O.C. Smith, the Shelby County Medical Examiner at the time of the incident, testified that he performed the autopsy on Wright and determined the cause of death to be a gunshot wound to the chest. The bullet penetrated Wright's lung and heart before exiting the body. The toxicology report revealed both alcohol and cocaine in Wright's system. His blood alcohol concentration was 0.13, the equivalent of eight or nine drinks in a two-hour period for someone Wright's weight. There was a "significant amount" of cocaine in Wright's system. Nevertheless, Wright's cause of death was not an overdose of alcohol or cocaine, but a gunshot wound to the chest.

**Defense Proof**

Jeanetta Martin, the defendant's younger sister, testified that the defendant, who was also known as "Ray-Ray," moved to Michigan when he was about nineteen years old but periodically visited his family in Memphis. On December 15, 2001, the defendant had been in Memphis for about two weeks. That night, Martin went to JT's Lounge on Bellevue Boulevard and South Parkway sometime between 11:00 p.m. and 12:00 a.m. to check on the defendant at her mother's request because her mother thought something had happened to the defendant. Her mother lived on Greenwood Street, near the area of Saxon Avenue and James Street.

Martin testified that she saw the defendant and his girlfriend, Sheila Hutton, sitting in the car outside the lounge having a conversation, and she talked to them for five or ten minutes before the couple headed inside to a party for Kenny Smith. She did not go inside because she was underage at the time. Martin recalled that the defendant was smiling and not upset. Approximately two days later, the defendant stopped by Martin's house to pick up some of his clothing on his way back to Michigan. She did not know he was a suspect in a homicide at the time. Martin noted that Sheila Hutton died two years before trial, and Kenny Smith died two months before trial.

The thirty-seven-year-old defendant testified that he moved to Flint, Michigan, at the age of nineteen after obtaining his GED and receiving a cooking school diploma. He had lived in Michigan since that time but made periodic two-week visits to Memphis to see his family. He was in Memphis visiting for the holidays on December 15, 2001. That night, he walked to JT's Lounge from his mother's neighborhood around 10:00 or 10:30 p.m. to meet Sheila Hutton and attend a party to celebrate the wedding anniversary of his friend, Kenny Smith. The defendant was standing outside talking to Hutton, who was sitting in her car, when his sister, Martin, arrived and talked to the couple. The defendant and Hutton remained at the party until 12:45 or 1:00 a.m. and then went to Beale Street until 3:00 or 4:00 a.m. Afterwards, the couple went to Hutton's house where they stayed the entire next day. The following day, the defendant met his sister to retrieve some clothes from her house and then rode a bus back to Michigan. The defendant found out that he was a suspect in a homicide several days after returning to Michigan, but he did not turn himself in "[b]ecause [he] didn't kill [Wright]." He knew that he would eventually be arrested because the police would find out he lived in Michigan.

The defendant testified that he told his attorney about Kenny Smith, and Smith had been contacted for a statement. However, Smith died two months before trial. His attorney also took a statement from Anthony Bradley who was at the party that night, but Bradley could not be located for trial. The defendant denied killing Wright and said he was not in the area of Saxon Avenue and James Street around midnight the night of the shooting. He acknowledged that he knew Tristan Turner but said he did not see him that night. He denied knowing Wilson.

On cross-examination, the defendant testified that he was living in Michigan in 1994 but admitted that he had been in Memphis and "detained" on February 5 and September 13, 1994. Although he lived in Michigan, he gave his probation officer his mother's address in Memphis when

he received a three-year sentence of probation in Tennessee. He admitted that he had been charged with several drug offenses in Memphis. The defendant said that the walk from his mother's house to JT's Lounge was about twenty to thirty minutes. On redirect, the defendant acknowledged that he had a drug problem in the past. He agreed that he visited Memphis periodically but said that he lived in Michigan. On recross examination, the defendant admitted, in response to an omitted question by the State, that he had been known to carry a gun. On re-redirect, the defendant denied carrying a gun on the night of December 15, 2001.

Following the conclusion of the proof, the jury convicted the defendant of all five counts as charged, and the trial court merged the felony murder and premeditated murder convictions and sentenced him to an effective term of life plus twenty-two years.

## ANALYSIS

### I. Evidence of Prior Arrests and Charges

During the jury-out voir dire of the defendant to discuss whether he would testify, several of the questions asked dealt with the effect of the State's failure to file a notice of impeachment and his understanding that he could not be questioned about his prior convictions as long as he did not "open the door." Thereafter, on cross-examination of the defendant, the State asked the defendant if he lived in Michigan in 1994 and, when he answered affirmatively, asked if he had been detained in Memphis on February 5 and September 13, 1994. Defense counsel objected, and a lengthy bench conference and jury-out conference ensued. The trial court found that the defendant had not opened the door to his prior convictions or arrests but allowed the State to question the defendant about his ninety days of incarceration and three years of probation in Memphis. The court stated that it was not allowing the questions under Tennessee Rule of Evidence 609, but instead to "contradict his testimony that he lived continuously [in Michigan] and was not [in Memphis] more than a couple of weeks at a time . . . . I'm allowing it for contradiction purposes, not really for impeachment purposes." The court said that "this . . . becomes relevant to contradict his claim that he has been not more than a couple of weeks -- he's lived continuously -- I think the one that impresses me the most is the ninety days -- well, not so much the ninety days, but the three years[.]"

Later in the bench conference, the trial court said: "[T]his is not really 608, I'm allowing this in because . . . it becomes relevant with regard to . . . contradicting his testimony about where he lived all this period of time, so it's really not 608. . . . [I]t's really . . . coming in under 404(b)[.]" The court noted that the questioning was relevant to contradict the defendant's testimony in direct examination, and not to prove propensity. The court found that the questioning "ha[d] an unusual degree of probative value" and that the probative value outweighed the prejudicial effect on the substantive issues. The court noted that the defendant's prior offense was a drug offense and, therefore, not similar to the offenses at hand.

Thereafter, on continued cross-examination, the defendant admitted that he gave his probation officer his mother's address in Memphis when he received a three-year sentence of

-5-

probation in Tennessee. He also admitted that he had received a number of charges in Memphis involving drugs. The State then asked, "You're saying you lived in Michigan -- well, we know you were here . . . April of '87. March of '88. August of '90. July of '91. April of '92. February of '94. September of '94. And then we have you back in 2005. But you say you lived in Michigan?" On redirect, the defendant acknowledged a past drug problem, and he maintained that he lived in Michigan but made periodic visits to Memphis.

After the defendant's testimony, the trial court gave the following limiting instruction to the jury and reaffirmed this instruction in its jury charge:

> If from the proof, you find that the defendant has committed a crime other than the one for which he is on trial, you may not consider such evidence to prove his disposition to commit the offense now on trial.
>
> This proof, if believed by you, may only be used by you in assessing the credibility of the defendant's testimony as to where he lived.
>
> Such evidence of another crime if considered for any purpose whatsoever, may only be considered for the purpose I just stated.

The defendant argues that the trial court erred in allowing the State to mention his prior arrests and convictions. He asserts that the evidence was offered purely for impeachment, but the court did not follow Tennessee Rules of Evidence 608 and 609 which would have brought to the court's attention that his prior convictions were stale. He also asserts that the evidence should have been excluded under Rule 404(b) because "his old arrests and stale convictions in Memphis are not material to identity - the sole issue in this case," and the prejudicial effect outweighs the probative value of the evidence. The State responds that the trial court did not abuse its discretion in permitting the prosecutor to impeach the defendant's testimony through "fact contradiction."

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence is admissible for other purposes, however, provided that the trial court (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Id.

Tennessee Rule of Evidence 608(b) provides, in pertinent part, that specific instances of conduct by a witness for the purpose of attacking or supporting the witness's character for truthfulness may be inquired into on cross-examination provided that: (1) the trial court holds a hearing outside the jury's presence and determines that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry; (2) the conduct occurred no more than ten years before the commencement of the action or prosecution; and (3) if the accused in a criminal

prosecution is the witness to be impeached, the State must give the accused reasonable written notice of the impeaching conduct before trial, and the court must determine, upon request, that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. Id.

Tennessee Rule of Evidence 609 provides that a conviction may be used to impeach the testimony of an accused in a criminal prosecution if the following four conditions are satisfied: (1) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (2) less than ten years has elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (3) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (4) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. Id.; State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999).

A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. Tenn. R. Evid. 611(b). This court has explained that

> fact contradiction [is] a device that is recognized by our courts. See, e.g., State v. McKinney, 74 S.W.3d 291, 317 (Tenn. 2002) (appendix). Through fact contradiction, a cross-examining party inquires about facts that conflict with the witness's testimony to show indirectly that the witness is untruthful. Neil P. Cohen et al., Tennessee Law of Evidence § 6.07[4][b] (4th ed. 2000).

State v. Johnny Owens and Sarah Owens, No. W2001-01397-CCA-R3-CD, 2002 WL 31624774, at *13 (Tenn. Crim. App. Nov. 8, 2002), perm. to appeal denied (Tenn. Feb. 18, 2003).

In State v. Tracy F. Leonard, No. M2001-00368-CCA-R3-CD, 2002 WL 1987963, at *16 (Tenn. Crim. App. Aug. 28, 2002), perm. to appeal denied (Tenn. Dec. 16, 2002), this court further explained fact contradiction as follows:

> It is proper for a party to contradict and discredit an adverse witness by showing the facts to be other than as testified to by such witness. See generally Neil P. Cohen et al., Tennessee Law of Evidence § 6.07[4][d] (4th ed. 2000). This method of impeachment is quite restricted. First, impeachment is not allowed as to "collateral" matters, so only if the point on which the witness' testimony is being contradicted is material to the issues in the case or is relevant to the witness' credibility apart from the contradiction may the contradiction be shown by the use of extrinsic evidence. Id. If the fact being contradicted is deemed collateral, counsel must use cross-examination of the witness being impeached to bring out the contradictory fact and must accept the witness' response, even if it is a denial that counsel could disprove. Id.

Trial court rulings on the propriety and form of cross-examination are subject to an abuse of discretion analysis, see, e.g., State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992), and such rulings will not be reversed on appeal absent an abuse of that discretion, see State v. Caughron, 855 S.W.2d 526, 541 (Tenn. 1993).

The defendant testified on direct examination that he had lived in Michigan since the age of nineteen and made periodic visits to Memphis lasting no more than two weeks. The State cross-examined the defendant about various times he "caught quite a few charges" in Memphis when he said he lived in Michigan for the stated purpose of discrediting his direct testimony that he was only a periodic visitor. Although the questioning had the side effect of exposing the defendant's involvement in prior bad acts, we cannot conclude that the trial court abused its discretion in allowing the questioning for purposes of contradicting the defendant's testimony on direct examination. See State v. Harry David Johnson, No. 03C01-9712-CR-00526, 1999 WL 318830, at *10 (Tenn. Crim. App. May 17, 1999), perm. to appeal denied (Tenn. Sept. 11, 2000) (approving fact-contradiction impeachment in situation where doing so implicated defendant in prior bad acts).

We note that because this evidence was collateral to the issues at trial in that its only apparent relevance is that it contradicted the defendant's testimony as to where he resided, see Neil P. Cohen et al., Tennessee Law of Evidence § 6.07[4][c] (5th ed. 2005), the evidence could be inquired into on cross-examination, but no extrinsic proof of such could be offered. See Tracy F. Leonard, 2002 WL 1987963, at *16. This procedure appears to have been properly followed in this case. It also appears that the trial court followed the procedure set out in Tennessee Rule of Evidence 404(b), with the stated "material" issue being calling into question the defendant's testimony on direct as to where he lived.

We acknowledge that this case presents a close call between whether the evidence was offered to impeach the defendant by contradicting his factual assertion that he lived in Michigan or offered to impeach the defendant based on prior bad acts under Rule 608.[2] However, under our standard of review on appeal, we conclude there was no error in allowing this evidence to be elicited on cross-examination. In any event, even if the court erred in allowing evidence of the defendant's prior criminal acts, any error was harmless in light of the proof of the defendant's guilt, the trial court's thorough limiting instruction to the jury, and the dissimilarity between the defendant's prior offenses and the offenses at hand.

## II. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing there was insufficient proof of his identity as the perpetrator of the offenses. When reviewing a challenge to the sufficiency of the convicting evidence, we note that the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

---

[2] Tennessee Rule of Evidence 609 was arguably not implicated because it was brought to the jury's attention that the defendant had received "charges" in Memphis, not convictions.

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In the light most favorable to the State, the evidence shows that James Wilson identified the defendant as the person who pulled a gun on him, demanded money, "clicked" the trigger, then turned the gun on James Wright and shot him. Wilson said that he could see the defendant's face clearly and was familiar with the defendant because he had known his family for over forty years. We note that the identity of the defendant as the perpetrator of the offense is a question of fact for the jury. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The identification testimony of the victim is sufficient, alone, to support a conviction. Id. In addition, Tristan Turner identified the defendant as the man he saw walking from the scene of the shooting and then running between houses upon seeing Turner. It was the jury's prerogative both to accredit the identification testimony of the State's witnesses and to reject the defendant's alibi defense. See State v. Cate, 746 S.W.2d 727, 729 (Tenn. Crim. App. 1987). We conclude that the evidence was sufficient to support the defendant's convictions.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE